386 F.2d 42
 FEDERAL HOME LOAN BANK BOARD, a sue and be sued agency of the United States, Federal Savings and Loan Insurance Corporation, a sue and be sued Federal corporation, and agency of the United States, Appellants,
v.
Sidney ELLIOTT, Winnie Bucklin, Mabel Fergus and John (Beans) Reardon, individually and as the Shareholders' Protective Committee of Long Beach Federal Savings and Loan Association, suing on behalf of all of the savings shareholders of said Association as a class, and Long Beach Federal Savings and Loan Association, a Federal mutual savings and loan association, Appellees.
FEDERAL HOME LOAN BANK BOARD, a sue and be sued agency of the United States, Federal Savings and Loan Insurance Corporation, a sue and be sued Federal corporation, Equitable Savings and Loan Association, a California corporation, Long Beach Federal Savings and Loan Association, a Federal mutual association, John Does 1 through 70,000, Appellants,
v.
Sidney ELLIOTT, Winnie Bucklin, Mabel Fergus and John (Beans) Reardon, individually and as the Shareholders' Protective Committee of Long Beach Federal Savings and Loan Association, suing on behalf of all of the savings shareholders of said Association as a class, Appellees.
FEDERAL HOME LOAN BANK BOARD, a sue and be sued agency of the United States, Federal Savings and Loan Insurance Corporation, a sue and be sued Federal corporation and agency of the United States, Long Beach Federal Savings and Loan Association, a Federal mutual association; Joseph Fields, a citizen of New York; Marion Fields, a citizen of New York; Ralph Fields, a citizen of New York; John Does 1 through 70,000, Appellants,
v.
EQUITABLE SAVINGS AND LOAN ASSOCIATION, a California corporation, Appellee.
 No. 20378.
 No. 20447.
 No. 20522.
 United States Court of Appeals Ninth Circuit.
 August 18, 1967.
 Rehearing Denied January 11, 1968.
 
 COPYRIGHT MATERIAL OMITTED John W. Douglas, Asst. Atty. Gen., J. William Doolittle, Acting Asst. Atty. Gen., Barefoot Sanders, Asst. Atty. Gen., Carl Eardley, Sherman L. Cohn, Florence Wagman Roisman, Morton Hollander, Attys., Dept. of Justice, Civil Division, Washington, D. C., Manuel L. Real, John K. Van de Kamp, U. S. Attys., Los Angeles, Cal., Kenneth E. Scott, Gen. Counsel, Max Wilfand, Asst. Gen. Counsel, Federal Home Loan Bank Bd., Washington, D. C., for appellants, Federal Home Loan Bank Bd., and Federal Savings & Loan Ins. Corp.
 Thomas C. Lynch, Atty. Gen., of State of Cal., Arthur C. DeGoede, David W. Halpin, Deputy Attys. Gen., Los Angeles, Cal., for appellant, Savings & Loan Comr. of Cal.
 Charles K. Chapman, Long Beach, Cal., for appellee, Long Beach Federal Savings & Loan Assn.
 George W. Trammell, Long Beach, Cal., for appellee, Shareholders' Protective Comm.
 Moore & Lindelof, Los Angeles, Cal., Louis C. Blau, Paul Gutman, Stanley Belkin, Beverly Hills, Cal., for appellee, Equitable Savings & Loan Assn.
 Pacht, Ross, Warne, Bernhard & Sears, Harvey M. Grossman, Los Angeles, Cal., for intervenor, N. Joseph Ross, Fitzpatrick & Wiley, Los Angeles, Cal., of counsel.
 Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.
 HAMLEY, Circuit Judge.
 
 
 1
 Three appeals have been consolidated for disposition under the above caption. They bring into question summary judgments, entered in three cases involving the merger of Long Beach Federal Savings and Loan Association (Long Beach), and Equitable Savings and Loan Association (Equitable). The effect of each judgment is to declare invalid the formula set forth in the merger agreement governing the distribution of Equitable's guarantee stock to Long Beach shareholders, and to substitute another basis upon which such distribution would be made. The district court opinion is reported. Elliott v. Federal Home Loan Bank Board, D.C.S.D. Cal., 233 F.Supp. 578.
 
 
 2
 We first state the underlying facts substantially as set forth in the Board's brief on this appeal.
 
 
 3
 Long Beach was chartered as a Federal Mutual Savings and Loan Association on July 10, 1934, under the Federal Home Loan Bank Act, 47 Stat. 725 et seq. (1932), as amended 12 U.S.C. § 1421 et seq. (1964).[1] In 1946, and again in 1960, the Federal Home Loan Bank Board (Board) determined that Long Beach had engaged in certain unsound financial operations. Proceeding under sections 1 et seq. of the Home Owners' Loan Act of 1933, 48 Stat. 128, as amended, 12 U.S.C. § 1461 et seq. (1964), the Board took over the management of Long Beach on both occasions.[2]
 
 
 4
 On February 14, 1962, a settlement agreement was entered into by and among Long Beach, the Board, and Federal Savings and Loan Insurance Corporation (Insurance Corporation), providing for the dismissal of all then pending litigation between those parties, and for the return of Long Beach to its private management.
 
 
 5
 Under the terms of the settlement agreement, Long Beach was given the right, if it so chose, to liquidate pursuant to a specific plan set forth in Article XV of that agreement. This plan provided for the transfer of Long Beach savings accounts to Equitable, a California state guarantee stock company. Under the agreement Equitable would, in turn, assume the liability associated with these transferred accounts. In consideration of such assumption of liability, Long Beach would transfer to Equitable an equal amount of Long Beach assets. The remaining assets of Long Beach, after payment or provision for payment of creditor claims, would be distributed to Long Beach shareholders on a pro rata basis.
 
 
 6
 Pursuant to the settlement agreement, Long Beach was returned to its private management on April 2, 1962. At that time, savings (share) accounts in Long Beach aggregated about $30,500,000. On the day of the return, April 2, approximately $24,000,000 were deposited in Long Beach, and on succeeding days until November, 1962, there were substantial additional deposits.[3]
 
 
 7
 In the meantime, in May, 1962, Long Beach management had informally submitted to the Board a proposed plan of merger between Long Beach and Equitable. This merger plan differed in substantial respects from the liquidation plan set out in Article XV of the settlement agreement. Under the merger plan, all, and not part, of Long Beach's assets and liabilities were to be transferred to Equitable. Under the merger, Long Beach shareholders would then receive payment for the value of Long Beach as a going concern-by way of distribution to them of Equitable guarantee stock, not from the proceeds of the liquidation of Long Beach assets as provided in Article XV of the settlement agreement.
 
 
 8
 Because of the substantial differences between the two plans, Long Beach sought Board approval of the merger agreement containing the new distribution terms. The two parties carried on negotiations as to the proposed merger from May 1962, to June, 1963. At the same time, Long Beach also sought the approval of the Savings and Loan Commissioner of the State of California (Commissioner).
 
 
 9
 In early July, 1962, while negotiations were proceeding in connection with the merger proposal, Thomas A. Gregory, president of, and principal negotiator for, Long Beach,[4] advised the Board that large withdrawals had been made from Long Beach after the payment of the June 30, 1962 dividend.
 
 
 10
 At the Board's request, Gregory submitted a list of accounts of $100,000 or over which had been opened at Long Beach on and after April 2, 1962, the date of Long Beach's return to private management. This list showed that seventy-seven such accounts, totalling in the aggregate about $20,500,000, had been opened, according to Gregory's characterization, by "celebrities of the financial and entertainment world widely known for their great wealth and business acumen."[5] There was also a dramatic increase in the number of large new accounts ranging from $20,000 to $100,000.[6] Approximately $10,000,000 of the $100,000 plus accounts were withdrawn after the June 30, 1962 dividend.
 
 
 11
 This influx of large accounts into Long Beach, most of which were opened by persons having no prior connection with Long Beach, was of grave concern to the Board. In the Board's view, disputed by Long Beach, the necessary net effect of this influx of new money, most of it borrowed for the purpose,[7] was to dilute the interests of the small and regular shareholders in the Long Beach net worth in the event of liquidation or merger.[8]
 
 
 12
 During the negotiations for approval of the merger plan, the Board took the position that, in permitting such a tremendous influx of new money of this sort, Long Beach management had breached its fiduciary duty by allowing these new large depositors to share in Long Beach's net worth.[9] The Board therefore indicated that it would not approve a pro rata distribution of Equitable stock to Long Beach shareholders. The Board reasoned that to allow the new large depositors to share in a pro rata distribution would have permitted these depositors to share in Long Beach's net worth to which, in the Board's view, they had contributed nothing.
 
 
 13
 Long Beach, on the other hand, took the position that there was no breach of fiduciary duty and that it needed all these deposits to maintain a secure position.[10] Long Beach also held the view that while losses were necessarily sustained in holding such large sums under certificates of deposit while paying a dividend thereon, this was necessary to provide adequate liquid assets to accommodate any possible future run on Long Beach.[11] In addition, Long Beach asserted that the influx of new savings deposits actually conferred major benefits.[12]
 
 
 14
 As an outgrowth of these conflicting views, Long Beach and Equitable agreed to insert in the merger agreement the distribution provisions here in question. In effect, these distribution provisions, set forth in Article VII and VIII of the merger agreement, denied participation rights in the distributable Equitable guarantee stock to the extent that new accounts, or additions to April 22, 1960 account balances, exceeded $10,000, and with respect to pledged accounts to the extent of the pledge.[13] In addition, these provisions restricted obvious "insiders" from participating in the distribution except to the extent of their April 22, 1960, account balances.
 
 
 15
 The merger agreement, with the restrictive distribution provisions included, was executed by Long Beach and Equitable on June 12, 1963. The Board conditionally approved it on June 14, 1963, the conditions being formal and technical. The Long Beach management shortly thereafter mailed a proxy statement, including copies of the merger agreement, to its members with its covering letter of June 17, 1963.
 
 
 16
 The Long Beach members approved the merger agreement overwhelmingly at their meeting on July 6, 1963. Ninety-six percent of all the votes cast for the merger at that meeting were cast by the Shareholders' Protective Committee of Long Beach Federal Savings and Loan Association (Committee).[14] Each favorable ballot, cast under authority of a proxy or otherwise, expressly stated that it was cast in reliance upon that portion of the new Article VII of the merger agreement which reads:
 
 
 17
 "This Agreement is not intended to prohibit any shareholder member of Long Beach from taking appropriate action to exercise such rights, if any, which he may have to contest the merits or validity of the plan of dissolution of Long Beach, or any part thereof, incorporated herein."
 
 
 18
 The Equitable stockholders voted their approval on July 13, 1963. The Commissioner granted his approval on August 28, 1963. The Board's final approval was given on September 5, 1963. On September 10, 1963, the merger was consummated by filing the merger agreement with the Secretary of State of the State of California.
 
 
 19
 Up to that time, no proceedings had been instituted to enjoin or otherwise test the validity of the merger agreement or any of its provisions. However, on September 10, 1963, the date upon which the merger agreement was consummated, two actions were commenced having this object in view. On September 17, 1963, a third action was filed having the same general objective. These are the three actions in which the summary judgments now under review were entered.[15]
 
 
 20
 The basic issue in each of these cases is the validity of the restrictive distribution provisions of Articles VII and VIII of the merger agreement. Long Beach, the Committee, and Equitable took the position that the provisions were invalid. The Board and the Commissioner contended that they were valid.
 
 
 21
 On October 28, 1963, a stipulation was entered into by the parties and approved by the court authorizing distribution of 585,821 of the 791,650 shares of Equitable guarantee stock. This distribution was to be made to former Long Beach shareholders to the extent that their accounts were unaffected by the restrictive distribution provisions of the merger agreement. The district court order effectuating the terms of the stipulation became effective on December 10, 1963. The ownership of 205,829 shares of Equitable stock remained in dispute.
 
 
 22
 Further pleadings were filed in the three cases and some discovery was had. Several joint pre-trial hearings were conducted and an order was entered consolidating the three cases for pre-trial and trial purposes. The parties then complied with the court's direction to file cross-motions for summary judgment.
 
 
 23
 The Committee, Long Beach and Equitable joined in a motion for a summary judgment declaring invalid the restrictive distribution provisions of Articles VII and VIII of the merger agreement, and requiring the distribution of Equitable's guarantee stock to be on a pro rata basis. The Board and the Commissioner moved for summary judgments dismissing the actions.
 
 
 24
 Pursuant to its memorandum opinion, findings of fact and conclusions of law, the district court entered summary judgments for the Committee, Long Beach and Equitable. 233 F.Supp. 578. The principal effects of the judgments are to declare invalid the retrictive distribution provisions contained in Articles VII and VIII of the merger agreement, and to require a pro rata distribution of Equitable guarantee stock to all eligible holders of Long Beach share accounts.[16]
 
 
 25
 The Board and the Commissioner have appealed.[17] They advance a number of arguments for reversal. We will consider first their argument that the district court was without power to change the terms of the merger plan by setting aside the restrictive distribution provisions contained in Articles VII and VIII of the merger agreement and substituting the pro rata distribution provisions set forth in the judgments.
 
 
 26
 The restrictive distribution provisions, set out in Articles VII and VIII of the merger agreement, had been approved by the Board and by the Commissioner. The district court determined that these distribution provisions were invalid. However, it did not set aside the merger.[18] Instead, the court formulated and compelled application of new merger provisions calling for a pro rata distribution of Equitable's guarantee stock. These new provisions have never been approved by the Board or the Commissioner. The Board and Commissioner contend that the district court was without power to make and enforce these changes in the merger agreement which had not been approved by the Board and Commissioner.
 
 
 27
 With reference to the need for obtaining Board approval of the merger agreement, section 5(d) of the Home Owners' Loan Act of 1933, 48 Stat. 133, 12 U.S.C. § 1464(d) (2) (1964), provides in part that the Board shall have the power to make rules and regulations "* * * for the reorganization, merger, and liquidation of Federal associations * * *"[19] Regulations governing the merger, dissolution, reorganization, and conversion of Federal associations are set out in 12 C.F.R. § 546 (Rev. as of January 1, 1963). Although one paragraph of that section (546.2) deals with the merger of two or more associations, and provides that such a merger shall not be effective unless and until approved by the Board, that particular paragraph does not apply where, as here, a state-chartered institution is to be the resulting association.
 
 
 28
 However, another paragraph of that section (546.4), dealing with the voluntary dissolution of federal associations, also requires prior approval by the Board. Although the transaction in question is not solely a voluntary dissolution of Long Beach, it does contemplate Long Beach's ultimate and voluntary dissolution. The Board and Long Beach, apparently regarding section 546.4 as the most nearly applicable Board regulation, employed that section as the regulatory channel through which the merger should be processed.
 
 
 29
 Thus Long Beach, on June 11, 1962, submitted to the Board an application for "dissolution by merger" with Equitable "* * * in accordance with Section 546.4 of the Rules and Regulations. * * *" Pursuant to the same regulation, the Board granted its approval after certain changes were made in the merger agreement, including the insertion of the restrictive distribution provisions embodied in Articles VII and VIII of the merger agreement. Neither in the administrative proceedings nor in the district court proceedings, did any party contend that 12 C.F.R. § 546.4, with its Board approval requirement, was inapplicable to this transaction.
 
 
 30
 It would therefore appear that, under section 5(d) of the Home Owners' Loan Act of 1933, and 12 C.F.R. § 546.4, no merger between Long Beach and Equitable, contemplating the survival of Equitable, could be effectuated except under terms and conditions approved by the Board.
 
 
 31
 The district court held, however, that despite this statute and regulation, Board approval was not required. The court so ruled on the ground that the transaction was actually consummated under the second unnumbered paragraph of section 5 (i) of the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464(i), which section does not require Board approval. See 233 F.Supp. at 592.
 
 
 32
 The court reached this conclusion after analyzing the second and third unnumbered paragraphs of section 5(i) of the Act. The second unnumbered paragraph, which does not require Board approval, provides for conversion of a federal savings and loan association to a state savings and loan association upon the vote of not less than fifty-one percent of the shareholders voting at a meeting specially called for that purpose, provided certain conditions set forth in that paragraph of that statute have been fulfilled. On the other hand the third unnumbered paragraph of section 5(i), which does require Board approval, does not require approval by vote of the shareholders.
 
 
 33
 The district court reasoned that since the Board required approval of a majority of the shareholders at a meeting specially called for that purpose, the Board must have been proceeding under the second unnumbered paragraph of section 5 (i), which does not require approval by the Board. However, an even more logical conclusion would be that the Board was proceeding under 12 C.F.R. § 564.4, which states in part:
 
 
 34
 "When a plan of dissolution has been approved by the board of directors of a Federal association and by the Board, such plan shall be submitted to the members of such association at a duly called meeting and, when approved by a majority of the votes cast at such meeting, shall become effective." (Emphasis added.)
 
 
 35
 In full compliance with section 546.4, after the Board had conditionally approved the merger agreement on June 14, 1963, it was submitted to the Long Beach members who approved the agreement by a majority vote at their July 6, 1963 meeting.
 
 
 36
 During the administrative and district court proceedings, none of the parties contended that the second unnumbered paragraph of section 5(i) was applicable to this merger transaction. That paragraph of section 5(i) deals not with the kind of transaction before this court, the merger of a federal savings and loan association with a state savings and loan association, but with the change of status of a federal savings and loan association to a state savings and loan association. The merger transaction involves two entities while a conversion transaction involves only one entity.
 
 
 37
 Moreover, the second unnumbered paragraph of section 5(1), which does not require Board approval, relates to a conversion from a federal mutual association to a state mutual association.[20] As the Board correctly points out, even if a conversion of a single entity from one form to another were stretched to include the merger of two entities, the "conversion" which took place here was not from a federal mutual to a state mutual, but from a federal mutual to a state stock association, the latter (Equitable) being the resulting or surviving institution.
 
 
 38
 We conclude that the second unnumbered paragraph of section 5(i) has no application to this transaction and therefore does not relieve the merging associations from the necessity of obtaining Board approval under the regulations referred to above.
 
 
 39
 With reference to the necessity of obtaining the approval of the Commissioner before a merger of a California state savings and loan association and a federal savings and loan association may be effectuated, sections 9203 to 9205 of the California Financial Code are controlling. Sections 9203 and 9204 authorize such mergers and specify conditions which must be met. Section 9205 expressly requires that any such merger must be approved by the Commissioner.
 
 
 40
 During the state and federal administrative proceedings, no one questioned the applicability of these state statutes, and Long Beach sought and obtained the Commissioner's approval of the merger agreement. Neither the district court, in its opinion, nor appellees, in this court, have questioned the applicability of these state statutes to merger transactions of the kind involved in this case.
 
 
 41
 However, with regard to both the federal and the state requirements for obtaining administrative approval, the district court concluded that the Board and Commissioner should be deemed to have agreed to submit the disputed validity of the contested provisions to a "court of competent jurisdiction."[21] Observing that this was a court of competent jurisdiction, the district court held that it had jurisdiction of the subject matter and the parties "* * * and there is nothing further the Bank Board can do even if the matter were remanded." Therefore, upon holding that the disputed provisions in the merger agreement were void, the court reasoned, in effect, that it was empowered to formulate and enforce new pro rata distribution terms as a part of the merger plan, without any approval by the Board or Commissioner.
 
 
 42
 One of the reasons given by the district court for disposing of the case in this manner is based upon the following provision in the approved merger agreement:
 
 
 43
 "This agreement is not intended to prohibit any shareholder member of Long Beach from taking appropriate action to exercise such rights, if any, which he may have to contest the merits or validity of the plan of dissolution of Long Beach, or any part thereof, incorporated herein."
 
 
 44
 In our opinion, the Board's approval of the merger agreement, with the inclusion therein of the provision preserving the right to litigate the merits or validity of the merger agreement or any part thereof, did not and could not, dispense with the necessity of obtaining approval of the Board and the Commissioner. Since the Board and the Commissioner are not parties to the merger agreement, the provision in question has no force as a contractual undertaking to abstain from performing their duties to approve or disapprove. Their approval of the provision does not represent a voluntary abandonment of the Board's and Commissioner's responsibilities in this regard, because the provision purports to do no more than restate the existing legal right of shareholders to test, judicially, the merits and validity of a merger plan.[22] Moreover, neither the Board nor the Commissioner has the power to contract away, voluntarily abandon, or delegate to the courts, their responsibilities fixed by statute and regulation, to approve or disapprove merger plans.[23]
 
 
 45
 The district court did not explicitly state in its opinion that provisions of the settlement agreement, which preceded the merger agreement, constituted Board approval of the pro rata distribution provisions required by the court. However, the district court did note that the Board had previously approved the pro rata provisions of the settlement agreement. Long Beach argues, in effect, that the Board's approval of the pro rata provision of the settlement agreement constituted implied approval of the pro rata distribution provision required by the trial court.[24]
 
 
 46
 It is true that Article XV of the settlement agreement evidenced the Board's approval of the liquidation plan set out therein, a plan which did provide for a pro rata distribution. However, under Article XV there was to be a pro rata cash distribution of Long Beach's surplus, not a pro rata distribution of Equitable's guarantee stock, as required under the subsequently-formulated merger agreement. At an earlier point in this opinion we have noted the substantial differences between the liquidation plan of Article XV of the settlement agreement and the dissolution plan of the merger agreement.[25]
 
 
 47
 Long Beach was not contractually bound to follow the liquidation plan of the settlement agreement, and it apparently had good reasons for not doing so. But when it decided to proceed by way of merger and dissolution, utilizing distribution and other terms substantially different from those of the Article XV plan, it was then required to once more seek approval of the Board and the Commissioner. Long Beach understood this and, as noted above, did seek and acquire the necessary approvals of the merger plan.[26]
 
 
 48
 Circumstances which developed after the Board approved the settlement agreement, particularly those having to do with the influx of large accounts into Long Beach, led the Board to conclude that a pro rata distribution arrangement would no longer be fair and equitable. Consequently, the Board required that the more restrictive distribution plan of Articles VII and VIII of the merger agreement be substituted for the pro rata arrangement.
 
 
 49
 Under all of the circumstances related above, the Article XV distribution plan of the settlement agreement does not, either in fact or in law, represent Board approval of the court-required pro rata distribution plan.
 
 
 50
 We do not question the power of a district court, in appropriate circumstances, to determine the legality of provisions of a particular merger-distribution plan. We hold, however, that under the circumstances of this case the district court was without power to remedy what it regarded as invalid distribution provisions of an administratively approved merger-dissolution plan, by designating a revised distribution plan, without the administrative approval required by state and federal statutes and regulations, which plan it thereafter compelled the parties to follow.[27]
 
 
 51
 The problem then arises as to what remedy was available, assuming that the district court was correct in determining that the restrictive distribution provisions of the approved merger agreement were invalid. The Board contends that, under the circumstances of this case, no remedy was available.
 
 
 52
 Among the various kinds of relief which might have been requested by plaintiffs, was an injunction to prevent the consummation of the merger on September 10, 1963.[28] However, suits were not filed until immediately after consummation of the merger. This relief was therefore not then available. It need only be added that Long Beach and the Committee did not seek injunctive relief of this character.
 
 
 53
 The Board seems willing to concede that a request to set aside the merger can be read into the general prayer for appropriate relief in the complaints. The Board argues, however, that relief of this kind is in any event not available because it is barred by laches. We question whether plaintiffs sought any such relief, but in any event we agree with the Board that such relief is barred by laches.
 
 
 54
 The doctrine of laches, in the area of corporate stockholders' remedies, is stated as follows in 13 Fletcher Cyclopedia Corporations (Perm.Ed.) § 5874, page 279:
 
 
 55
 "If a stockholder, with knowledge of wrongful acts on the part of the directors or a majority of the stockholders, stands by for an unreasonable time without taking any steps to set the acts aside or otherwise interfere, and rights are acquired by others, his right to sue is barred by his laches, however clear his right to relief would have been if he had moved promptly."[29]
 
 
 56
 As indicated by this statement of the doctrine, three elements must be present for the defense of laches to apply: (1) full knowledge of the facts, (2) unreasonable delay in the assertion of an available remedy, and (3) intervening prejudice to another. All three of these elements are present with respect to any effort in these suits to set aside the merger of Long Beach and Equitable.
 
 
 57
 All Long Beach shareholders, the members of plaintiff Committee, and Long Beach, were on notice of all material facts with respect to the proposed merger after the mailing of the proxy statement in mid-June, 1963. A copy of the merger agreement, executed by Long Beach and Equitable on June 12, 1963, was attached to that proxy statement. It follows that these shareholders, the Committee and Long Beach had from at least the middle of June, 1963, until September 10, 1963, when the merger was consummated, within which to institute litigation seeking to enjoin the merger and dissolution. Instead, they deliberately chose to wait until the merger had been effectuated, before commencing court proceedings testing the validity of the merger plan.
 
 
 58
 The result was that, before the actions were filed, substantial rights had attached growing out of the effectuation of the merger, which rights would necessarily have been prejudiced if, as an out-growth of the three court actions, the merger were to be set aside. Principal among these were the rights of the shareholders of Long Beach and Equitable, as of the day of the filing of the merger, to enjoy the benefits of the merger.
 
 
 59
 These shareholders had not surrendered or prejudiced these rights in advance by voting for a merger agreement containing the provision permitting a court test of the distribution provisions. They were agreeing only to such litigation, necessary to test the validity of those provisions, as could be accomplished without setting aside a merger once effectuated. Everyone concerned knew, at the time the merger agreement was approved, that there was time to commence such a suit before completion of the merger, thus making it possible to postpone the merger, voluntarily or by injunction, until the court test could be resolved.
 
 
 60
 In addition to prejudicing these rights of Long Beach and Equitable shareholders, who were such on the date of the merger, a setting aside of the merger would also prejudice the rights of Equitable shareholders who became such after the merger. Moreover, the practical difficulty, if not impossibility, of unscrambling and returning the intermingled assets of the merged Long Beach and Equitable associations, would be seriously prejudicial to Equitable.[30]
 
 
 61
 The only other relief which is arguably available as an outgrowth of these actions is a judicial determination that the distribution provisions of the merger agreement are invalid. This, in turn, would call for the formulation of new distribution provisions, such as the pro rata arrangment, approved by the court with or without the approval of the Board and the Commissioner. It might be urged that, following this course of action, the revised distribution provisions could be made a part of the existing merger plan without setting aside the merger.
 
 
 62
 However, we have already stated why the district court is without power to formulate and enforce a new distribution plan free and clear of Board and Commissioner approval. And a remand to the Board and Commissioner for the formulation or approval of a new plan is inappropriate absent power in those agencies to approve or disapprove, as a whole, what would then become a revised merger plan. Stated differently, the Board and the Commissioner have no authority to review and consider provisions of a merger plan except in performance of their function to approve or disapprove the merger plan as a whole. The latter power no longer exists because the merger is in effect and laches bars plaintiffs from setting the entire merger aside.
 
 
 63
 There is still another obstacle to any court relief involving substitution of new distribution provisions for those presently set forth in the merger agreement without upsetting the merger. A merger must be the product of an agreement approved by the affected shareholders. The shareholders of Long Beach and Equitable have not approved of a merger agreement containing distribution provisions different from those in the agreement under which the merger was effectuated. Their approval of a revised merger agreement would therefore be necessary.
 
 
 64
 Several difficulties would be encountered in seeking shareholder approval of a revised merger agreement at this late date. Without doubt, many individuals who were shareholders of Long Beach and Equitable when the vote was taken on the original merger plan, are no longer shareholders of Equitable, the surviving association. Likewise, in all probability, Equitable now has many shareholders who were not shareholders of Long Beach or Equitable when the original merger vote was taken. Moreover, all shareholders who would now be called upon to vote on a revised merger plan would be confronted by a coercive factor which was not present when they voted on the original merger proposal, namely, that the merger had been consummated. In addition, should the outcome of a new vote indicate disapproval, further turmoil, uncertainty and delay would be interjected.[31]
 
 
 65
 Thus we conclude that laches is a bar to these suits, whether the relief sought would or would not require a setting aside of the merger. In summary, by deliberately waiting with their law suits until after the merger had been consummated, the Committee and Long Beach sought to confront the court with an accomplished fact which would enable them to test the validity of the distribution provisions without interfering with the consummation of the merger. But the entanglements described above require us to characterize this studied delay as laches, barring any relief which might otherwise have been available.
 
 
 66
 For the reasons stated above, and without reaching the several other complex questions raised on these appeals, the judgments are reversed, and the causes are remanded with directions to dismiss the actions and return the impounded stock for distribution in accordance with the provisions of the merger agreement.
 
 
 
 Notes:
 
 
 [1]
 The first charter was replaced by a second charter on July 10, 1937
 
 
 [2]
 These take-overs and related actions resulted in extensive federal litigation which has many times been before this court and the United States Supreme Court. See Elliott v. Federal Home Loan Bank Board, D.C.S.D.Cal., 233 F.Supp. 578, 584, n. 1, for a comprehensive list of previous court decisions. In addition to the three appeals dealt with in this opinion, nineteen other appeals and a writ proceeding related to this general controversy are now pending in this court, and still other proceedings are in progress in the district court
 
 
 [3]
 As of April 30, 1962, Long Beach savings accounts had climbed to about $65,800,000. From then until November 30, 1962, the net increase in savings accounts was approximately $5,700,000, bringing the total of all accounts to about $71,500,000 on that date
 
 
 [4]
 During this period of merger negotiations, Gregory was also the beneficial owner of a substantial block of Equitable stock. As late as June 20, 1963, his name was carried on Equitable's stationery as vice-president
 
 
 [5]
 This increase in the number of large deposits was a marked change from the situation that existed on April 22, 1960, when Long Beach was taken over by the Board. At that time Long Beach, with savings accounts of approximately $96,000,000, had only one account in excess of $100,000
 
 
 [6]
 In April, 1960, there was only one account in the $75,000 to $100,000 range. During the period between April 2, 1962, and November 30, 1962, there were six such accounts, none of the owners of which had previously been Long Beach shareholders. In April, 1960, there were no accounts in the range of $50,000 to $75,000. In the 1962 period referred to above, there were thirty-four such accounts, only two of which were owned by previous Long Beach shareholders. In April, 1960, there were thirty-three accounts on deposit in the range from $20,000 to $50,000. In the 1962 period, there were 124 such accounts, only eighteen of which were owned by previous Long Beach shareholders
 A later analysis of Long Beach accounts which increased by $10,000 or more between April 2 and November 30, 1963, revealed equally marked contrasts in the $20,000 to $100,000 range.
 
 
 [7]
 Of the aggregate of more than $28,000,000 in accounts which had been increased by $10,000 or more between April 2, 1962, and November 30, 1962, over $12,000,000 of such accounts were pledged as of November 30, 1962, to secure loans. The proceeds of most of these loans had been deposited in Long Beach. The principal pledgee of these accounts was the City National Bank of Beverly Hills which, as of November 30, 1962, had outstanding loans of over $8,000,000, the proceeds of which had been deposited in Long Beach. Mr. Hart, the President of the City National Bank, was a substantial stockholder in Equitable, as was one of its other officers, Curtis Palmer
 
 
 [8]
 The Board also argued that, because of this sudden and large inflow, Long Beach was in no position to invest the new money quickly, yet had to pay a dividend to the new savers ranging from 4.5 percent to 4.8 percent. Consequently, Long Beach operated at a loss of over $100,000 per month during the period from January 1, 1963 to September 10, 1963, and this development in turn resulted in a substantial reduction in net worth
 
 
 [9]
 Under sections 6(e) and (f) of the Long Beach by-laws, management had the power to prevent such an influx by limiting share payments which could be accepted, or by rejecting any application for a share account
 
 
 [10]
 In its proposed finding of fact No. 28, Long Beach stated:
 "28. In March-April, 1962, Long Beach Federal's officers and its Shareholders' Protective Committee wished to rehabilitate the precarious financial condition of the seized Association. They felt substantial new savings deposits were urgently and immediately required for such rehabilitation. The first few days of the restored Association upon its return to its founding management were believed to be the most critical time."
 
 
 [11]
 Long Beach had lost $10,000,000 of its savings deposits in a run of withdrawals, following the Board's 1946 seizure of Long Beach. It had similarly lost $69,000,000 in 1960, reducing Long Beach's then total of savings deposits from over $96,000,000 to about $28,000,000
 
 
 [12]
 As stated in its opening brief on these appeals, Long Beach believes that the deposit of these additional sums were beneficial in the following respects:
 "(a) Equitable paid $3,000,000 in guarantee stock for the goodwill of the restored Association. Said goodwill resulted solely from the new $42,000,000 of savings deposits.
 "(b) The additional $3,000,000 to be impounded for 10 years was released for immediate distribution among the Long Beach Federal depositors. Equitable's assumption of all Long Beach Federal liabilities, known as well as unknown, made this release possible.
 "(c) Approximately $3,884,000 of possible income taxes were saved. The $42,000,000 in new savings deposits under 26 U.S.C. 593 created a tax shelter of 12% or about $5,000,000. This tax shelter enabled Long Beach Federal to received [sic] the $5,000,000 compensation paid it by appellants Bank Board and Insurance Corporation as damages, tax free. The $5,000,000 tax shelter also enabled Long Beach Federal to transfer its surplus to Equitable without taxes which might otherwise have wiped out the distribution." (Record references and footnotes omitted.)
 In its reply brief the Board took issue with all of these assertions.
 
 
 [13]
 April 22, 1960 is the date upon which Long Beach was seized for the second time by the Board. The $10,000 figure was selected because the Board believed that new accounts would generally not be opened by bona fide savers in amounts larger than the then maximum amount of $10,000 federal account insurance for any one account
 
 
 [14]
 This is a committee of Long Beach savings depositors formed in 1946. The Committee has, since then, continuously engaged in litigation concerning the affairs of Long Beach, particularly Long Beach's controversy with the Board
 
 
 [15]
 The first of these actions (No. 63-1072 PH), described as one to quiet title and for declaratory relief, was brought in the United States District Court, Southern District of California, Central Division, (now Central District) by Long Beach and four individuals constituting the Committee, the latter suing as individuals, as the Committee and as representatives of the entire class of Long Beach shareholders
 The Insurance Corporation, organized pursuant to section 402 of the National Housing Act, 48 Stat. 1256 (1934), 12 U.S.C. § 1725 (1964), is an agency of the United States. Because of its identity of interest with that of the Board, we will not hereafter make separate reference to the Insurance Corporation.
 The second action, which was also one to quiet title and obtain declaratory relief, was filed in the California Superior Court by the same individuals, suing in the same capacity as were plaintiffs in the district court action filed on the same day. The defendants in this action are the Board, Equitable, Long Beach and "John Does 1 through 70,000." On October 10, 1963, the Board removed this action to the district court, where it was docketed as No. 63-1230 PH.
 The third action (No. 63-1107 PH) was filed in the district court by Equitable against the Committee, the Board, Long Beach and some individual Long Beach shareholders. This action was described as one in interpleader and for declaratory relief. At the time it commenced this action, Equitable deposited with the clerk of the district court the 791,650 shares of its guarantee stock which, under the terms of the merger agreement, it was contractually obligated to distribute to Long Beach shareholders.
 During the course of the trial court proceedings, the Commissioner was added as a party defendant in Civil Actions Nos. 63-1107 PH and 63-1230 PH. Equitable was added as a party defendant in Civil Action No. 63-1072 PH. The Commissioner moved to dismiss the two actions in which he had been added as a party, challenging the district court's jurisdiction on the ground of sovereign immunity. The Board contended that the Commissioner was an indispensable party in all three actions and that if he was not subject to the jurisdiction of the district court, the actions must be dismissed. The trial court denied the two motions to dismiss filed by the Commissioner.
 
 
 [16]
 By "pro rata" distribution, the court meant that each "eligible holder of share accounts" of Long Beach is the owner of that number of the 791,650 shares of Equitable guarantee stock which is pro rata in proportion that the "eligible balance" of each eligible holder of share accounts, respectively, bore to the aggregate total of all eligible share accounts in Long Beach immediately prior to the consummation of the merger agreement at 8:30 a. m. on September 10, 1963, less costs and attorneys' fees which might be thereafter allowed
 The judgments provide that the words "eligible holder of share accounts" mean a depositor having an account or accounts and holding a regularly issued pass book immediately prior to 8:30 a. m. on September 10, 1963. The judgments also provide, with an exception not here relevant, that the words "eligible balance" mean the amount of each such share-account of each eligible holder of share account or accounts, as of the close of business on November 30, 1962, less withdrawals from such account or accounts after November 30, 1962, and immediately prior to 8:30 a. m. on September 10, 1963, the last-in first-out rule being applied to such withdrawals.
 
 
 [17]
 This court granted a stay of compliance with the district court's judgment pending disposition of the appeal
 
 
 [18]
 We will discuss below the question of whether, under the circumstances which confronted the court, it could have set aside the merger
 
 
 [19]
 Under section 2(d) of that act, 12 U. S.C. § 1462(d) (1964), the term "association" is defined as a Federal Savings and Loan Association chartered by the Board as provided in section 5 of the act, 12 U.S.C. § 1464
 
 
 [20]
 This is made clear by the sixth proviso of the second unnumbered paragraph of section 5(i), which reads:
 "* * * (6) that, in the event of dissolution after conversion, the members or shareholders of the association will share on a mutual basis in the assets of the association in exact proportion to their relative share or account credits; * * *."
 
 
 [21]
 The district court pointed out that, in advance of the Board's approval of the merger agreement, the Board was notified that Long Beach and the Committee were going to contest the validity of the distribution terms of the merger agreement, and that Equitable would probably file a suit in interpleader. The district court further observed that, with this knowledge, the Board nevertheless approved the merger agreement. The court added that in reliance upon this provision of the merger agreement permitting legal testing of any part of it, the parties proceeded to and did complete the merger, and immediately thereafter filed the suits now before us
 
 
 [22]
 The provision did serve the purpose of assuring shareholders that, by voting for the merger, or abstaining, they had not waived their right to engage in such litigation
 
 
 [23]
 Prior to its conditional approval of the merger agreement on June 14, 1963, it was made clear to Long Beach that the Board did not regard that agreement as accomplishing a surrender of the Board's approval or disapproval function. This is evidenced by a Board letter, dated May 30, 1963, in which Gregory, President of Long Beach, was told:
 "For your information, it is the Board's position that, insofar as it is concerned, no Long Beach shareholder who abstains from voting on the plan at the meeting of Long Beach members will be prejudiced in any way by such abstention in the event action should be instituted against the Board, et al. attacking the validity or merits of the plan, in whole or in part. The Board will otherwise employ every legal defense available to it to defend the plan's validity and its merits. The Board believes that, since the plan will have been proposed by the management of Long Beach and approved by Long Beach members, Long Beach Federal will necessarily either have to defend the plan or take a neutral position. To do otherwise would be inconsistent with the action of its management and with the vote of its members approving the plan." (Emphasis supplied.)
 
 
 [24]
 The settlement agreement did not involve the Commissioner, so nothing provided therein could possibly constitute the Commissioner's approval of anything
 
 
 [25]
 In a letter from the Board to Gregory, President of Long Beach, dated January 17, 1963, the Board made it quite clear that "* * * Article XV of the Settlement Agreement was not applicable to that plan of dissolution of Long Beach by way of merger with Equitable and that Board approval was necessary before such plan could be submitted to the shareholders for their approval."
 
 
 [26]
 The last paragraph of Article XVII of themerger agreement evidences Long Beach's recognition that the merger agreement was not an implementation of the Article XV liquidation plan of the settlement agreement, but was an alternative to it. Article XVII of the merger agreement reads in part:
 "Each Association does hereby reserve, pending consummation hereof, all rights and agreements between the parties pertaining to carrying out the purposes and intent of Article XV of that certain Settlement Agreement made between the Federal Home Loan Bank Board, Federal Savings and Loan Insurance Corporation and Long Beach Federal Savings and Loan Association dated February 14, 1962, and each Association specifically agrees that in the event, for any reason, the within Merger Agreement not be consummated, that each Association shall be bound by the agreements between the Associations pertaining to said Article XV and shall exert every effort to consummate the same."
 
 
 [27]
 See Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 97 L.Ed. 15; Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 767, 67 S.Ct. 1493, 91 L.Ed. 1796; S.E.C. v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626; Fascination, Inc. v. Hoover, 39 Cal.2d 260, 268, 246 P.2d 656, 661
 
 
 [28]
 Under some circumstances, shareholders aggrieved by a merger plan containing improper distribution provisions, might have a claim for damages for conversion against the surviving corporation. However, no such claims were asserted or litigated in the suits now before us
 Another possible remedy might have been the assertion of appraisal rights by aggrieved shareholders. Again, however, the complaints in the actions before us do not request such relief.
 
 
 [29]
 See, also, 70 A.L.R. 53, annotation; Mardel Securities, Inc. v. Alexandria Gazette Corporation, 4 Cir., 320 F.2d 890, 896; Narragansett Electric Lighting Co. v. Sabre, 51 R.I. 37, 150 A. 756, 759, 70 A.L.R. 46. Laches is a defense to the action of a minority stockholder or shareholder to set aside corporate acts whether fraudulent or ultra vires. Baker v. Spokane Sav. Bank, 9 Cir., 71 F.2d 487, 492
 Although the Committee purports to represent a majority of the shareholders of Long Beach, the position which the Committee takes in this litigation is obviously adverse to the interest of all of the shareholders, comprising an overwhelming majority, who stand to gain by the restrictive distribution provisions of the merger agreement, and stand to lose by the pro rata distribution provisions of the judgments under review. In this litigation, then, the Committee (and Long Beach, since it joins in the Committee's position) actually occupy the status, or represent the interests, of minority shareholders challenging the terms of the approved merger agreement.
 
 
 [30]
 Equitable, which was an interpleader in the district court, represents to us that it would be "impossible"' to now divest Equitable of the Long Beach assets and liabilities. Nearly four years have passed since the merger went into effect on September 10, 1963. Equitable urges that, after the passage of this much time, the present Equitable assets and liabilities cannot be divided into a "Long Beach bundle" and an "Equitable bundle."
 
 
 [31]
 Having in view the extensive prior history of this controversy and the pendency of further litigation in this court and the district court (see note 2, above), it is easy to foresee the possibility that, unless soon brought to rest, this litigation could swallow up a substantial part of the excess Long Beach assets the parties are fighting about, and at the same time seriously cripple Equitable, as the surviving association