ANTOINE L. GARABET, M.D., INC., and, Abraham V. Shammas, M.D., Inc., both doing business as The Laser Eye Center, Plaintiffs,

v.

AUTONOMOUS TECHNOLOGIES CORPORATION and Summit Technology, Inc., Defendants.

No. CV9904692 ABC (SHx).

United States District Court, C.D. California, Western Division.

Sept. 18, 2000.

**1160**

Alioto & Alioto, John Alioto, Linda Alioto, Margaret Weems, San Francisco, CA, for plaintiff/petitioner/appellant.

Blanc, Williams, Johnston & Kronstadt, John Kronstadt, Los Angeles, CA, Arnold & Porter, Mark Merley, Anika Cooper, Washington, D.C., for defendant/respondent/appellee.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COLLINS, District Judge.

This case involves federal antitrust claims and state unfair competition claims challenging the merger of two corporations engaged in the design, development, sale, and licensing of Laser Vision Correction ("LVC") equipment, which enables surgical correction of vision problems including far-sightedness, nearsightedness, and astigmatism. After reviewing the papers submitted by the parties, the case file, and oral argument, the Court hereby GRANTS Defendants' motion for summary judgment.

### I. PROCEDURAL HISTORY

On April 29, 1999, Plaintiffs Antoine L. Garabet, MD., Inc., and Abraham V. Shammas, M.D., Inc., d/b/a The Laser Eye Center, filed a Complaint against Defendants Autonomous Technologies Corp. ("ATC") and Summit Technology, Inc. ("Summit"). Plaintiffs assert that the April 29, 1999 merger of the two Defendant corporations, as well as the June, 1998 agreement between Defendant Summit and another LVC equipment corporation, VISX, constitute restraints of trade and monopolization in violation of the Clayton Act Section 7 (15 U.S.C. § 18), the Sherman Act Section 1 (15 U.S.C. § 1), and California's Unfair Competition Statute (Cal.Bus. & Prof.Code § 17200 *et seq.*). Plaintiffs seek a judgment that Defendants have committed antitrust violations, divestiture of the merger under Clayton Act Section 16 (15 U.S.C. § 25), treble damages under Clayton Act Section 4 (15 U.S.C. § 15), and injunctive relief, restitution or disgorgement under the Unfair Competition Statute. Defendants filed their First Amended Answer ("FAA") July 1, 1999.

On June 30, 2000, Defendants filed the instant Motion for Summary Judgment ("Motion"). Defendants assert that Plaintiffs, having never purchased any LVC equipment from Defendants, lack the req-

uisite standing to sue for damages under Clayton Act Section 4, or for equitable remedies under Clayton Act Section 16. Further, Defendants argue that Plaintiffs are barred by the doctrine of laches from pursuing any equitable remedy. Finally, Defendants argue that the state claim, predicated as it is on the underlying federal claims, also fails. On February 14, 2000, Plaintiffs filed their Opposition. On March 3, 2000, Defendants filed their Reply. On September 18, 2000, the Court heard oral argument.

## II. SUMMARY JUDGMENT STANDARD

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978) (citations omitted).

If the moving party has the burden of proof at trial (*e.g.*, a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting from Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).

If the opponent has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

In general, it may be difficult to resolve antitrust cases on summary judgment because of their factual complexity. *See Carter v. Variflex*, 101 F.Supp.2d 1261, 1264 (C.D.Cal.2000) (citing *Rickards v. Canine Eye Registration Found.*, 783 F.2d 1329, 1332 (9th Cir.1986)). However, this does not mean that a district court may not award summary judgment, even in an antitrust case, where appropriate. *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–598, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (granting summary judgment). As the Ninth Circuit has shown, summary judg-

ment may often be appropriate on an antitrust claim. *See Bhan,* 929 F.2d at 1409.

### III. FACTUAL BACKGROUND

Plaintiffs in this matter, Drs. Garabet and Shammas, practice refractive eye surgery, doing business together as the Laser Eye Center in various locations in the state of California. The Laser Eye Center makes use of LVC equipment in its corrective surgery practice, and has done so for at least several years. Corrective eye surgery is apparently a rapidly-growing practice. Defendants Summit and ATC are two formerly-separate corporations engaged in the design, development, sale, and license of LVC equipment. *See* Complaint ¶¶ 5–7, 11, 15, 17; FAA ¶¶ 6, 15, 16, 18.

The operative facts of Plaintiffs' Complaint are as follows. On October 20, 1995, Summit received FDA approval to market its laser system to treat low to moderate myopia, and in March, 1998, Summit received FDA approval to market its laser system to treat astigmatism. In or about March, 1996, VISX received FDA approval to market its laser system to treat low to moderate myopia, and in or about April, 1997, VISX received FDA approval to market its laser system to treat astigmatism. *See* Complaint ¶ 21; FAA ¶ 21.

In June, 1998, Summit entered into an agreement with VISX to dissolve a previous partnership ("Pillar Point Partners") between the two corporations, to resolve pending litigation between the parties, and to grant one another fully paid-up (royalty-free) cross-licenses to certain patents related to LVC technology owned by each corporation. *See* Complaint ¶¶ 8, 26; FAA ¶¶ 8, 26. This agreement followed entry of a consent order reached as the outcome of an FTC administrative complaint against Pillar Point Partners. One provision of the consent order required dissolution of Pillar Point Partners. *See* Complaint ¶ 22; FAA ¶ 22.

Since 1993, ATC has been engaged in design and development of LVC equipment. *See* Complaint ¶ 6; FAA ¶ 6. In November, 1998, the FDA gave premark-eting approval to ATC's LADARVision System for treatment of mild to moderate myopia with or without astigmatism. *See* Complaint ¶ 6; FAA ¶ 6. In or about December, 1998, the FDA also approved an LVC system from another corporation, Nidek, for treatment of myopia and low to moderate nearsightedness, without astigmatism. Aside from the recent market entry of Bausch & Lomb and Lasersight, Inc., two other corporations seeking to market LVC equipment, ATC, Summit, VISX, and Nidek are the major players in the LVC market. *See* Complaint ¶¶ 29, 32; FAA ¶¶ 29, 32.

The parties estimate that in 1998 VISX accounted for seventy-five percent of LVC procedures performed in the U.S., while Summit accounted for twenty-five percent. In November, 1998, VISX got FDA approval to market its LVC systems to treat farsightedness; VISX is the only supplier of LVC equipment that currently has FDA approval to treat farsightedness. *See* Complaint ¶ 31; FAA ¶ 31.

There is some history of litigation between these parties, as well as in the industry in general. In December, 1997, Plaintiffs herein filed a Complaint in the Northern District of California against Summit, VISX, and Pillar Point Partners, seeking, *inter alia,* a declaration of noninfringement of patents. The action was subsequently transferred to the District of Arizona, and Summit counterclaimed for patent infringement on February 16, 1999. The case is currently pending in federal court in the District of Arizona. *See* Complaint ¶ 7; FAA ¶ 7; *In re Pillar Point Partners Antitrust and Patent Litigation,* MDL Docket No. 1202 (D.Az.) (appended to the Motion as Appendix Exhibit ("Mot. App.Ex.") 4).

In or about October, 1996, ATC filed suit against Pillar Point Partners, Summit, and VISX, alleging noninfringement of patents, as well as unenforceability and invalidity of certain patents. On September 24, 1998, VISX filed a counterclaim against ATC seeking, *inter alia,* a declaratory

judgment of infringement and preliminary and permanent injunctions. *See* Complaint ¶¶ 25, 27; FAA ¶¶ 25, 27. In January, 1999, Summit sued Nidek for patent infringement after Nidek refused to enter licensing discussions. Nidek has filed counterclaims. *See* Complaint ¶ 29; FAA ¶ 29. In addition, it appears that there are several other ongoing actions between these parties or other plaintiffs and defendants. Their details are not significant to the resolution of this case.

On October 1, 1998, Summit publicly announced its intention to acquire ATC. *See* Statement of Uncontroverted Facts ("UF") ¶ 4; Plaintiffs' Separate Statement of Genuine Issues of Material Fact ("IMF") ¶ 4. The merger agreement called for ATC to merge with a wholly owned subsidiary of Summit. In accordance with the merger, VISX and ATC entered into a stipulation that had the effect of staying the litigation between VISX and ATC until the merger was completed. As part of the stipulation, ATC agreed not to deliver its LADARVision System (approved November 2, 1998) within the U.S. for a defined period of time. *See* Complaint ¶ 28; FAA ¶ 28.

The FTC reviewed Summit's acquisition of ATC. On March 17, 1999, Summit and ATC publicly scheduled shareholder meetings to approve Summit's acquisition of ATC. On March 24, 1999, Summit publicly disclosed that the FTC had decided not to challenge the acquisition of ATC at the present time. On the morning of April 29, 1999, the merger was consummated. *See* UF ¶¶ 5–8; IMF ¶¶ 5–8.

Summit acquired ATC for approximately $220 million in cash and stock. As a result of its acquisition by Summit, ATC gained access to Summit's royalty-free license to VISX's patents relating to LVC equipment. Therefore, VISX's claims of

patent infringement in the counterclaim filed against ATC in September, 1998 are moot. *See* UF ¶ 23; IMF ¶ 23; Complaint ¶ 28; FAA ¶ 28.

The parties dispute the extent to which Summit and ATC have integrated their operations since the April, 1999 merger. Summit states it has spent $45 million on integration, integrating sales and service forces. *See* UF ¶¶ 11, 13.[1] Furthermore, the parties do not dispute that approximately 20 positions have been cut as part of post-merger restructuring, and that Summit has taken over manufacture of the lasers used in ATC systems. *See* UF ¶¶ 12, 14; IMF ¶¶ 12, 14. However, the Plaintiffs claim that the companies are as of yet only partially restructured. *See* IMF ¶ 10.

It is not disputed that Plaintiffs were aware of the proposed merger as early as the Fall of 1998. *See* UF ¶ 15; IMF ¶ 15. Nor is it disputed that prior to the consummation of the merger, there were at least two occasions on which Plaintiffs threatened to file suit to stop the merger but did not do so. *See* UF ¶¶ 18–19; IMF ¶¶ 18–19 (letters April 26 & April 28, 1999 threatening a TRO).[2] It is also undisputed that at least by April, 1999, Plaintiffs had retained counsel in regard to this matter. *See* UF ¶ 16; IMF ¶ 16.

Plaintiffs eventually filed suit on April 29, 1999, after the merger had closed. After the complaint was filed, counsel for the Plaintiffs stated in writing their intention to seek a preliminary injunction directed at the merger. *See* UF ¶¶ 20–21; IMF ¶¶ 20–21.

It is further undisputed that Plaintiffs have not purchased any laser systems from either Summit, ATC, or the merged company. Plaintiffs have purchased twelve laser systems from Nidek, a non-defendant, non-conspirator manufacturer of

---

1. Plaintiffs have raised numerous evidentiary objections to the facts asserted by Defendants. Though not individually addressed, these objections have been considered and overruled by the Court.

2. Defendants assert that Plaintiffs threatened suit as early as December, 1998. *See* UF ¶ 17. Plaintiffs object, citing Fed.R.Evid. 408. Without more background, the Court declines to rule on the objection, so will not consider this fact in its analysis.

LVC equipment, since consummation of the Summit/ATC merger. In addition, Plaintiffs have never paid any per procedure licensing fees to Summit or ATC. Plaintiffs also concede having no current intention of acquiring an LVC system from Summit or ATC. *See* UF ¶¶ 1–3; IMF ¶¶ 1–3.

The Laser Eye Center is among the largest centers performing LASIK surgery in the U.S. Plaintiffs' business has grown steadily since 1996, and commands a significant part of the market for LVC procedures in greater Los Angeles. *See* UF ¶¶ 25–34; IMF ¶¶ 25–34.

## IV. DISCUSSION

Plaintiffs claim that the merger of Summit and ATC, alongside the June, 1998 agreement between Summit and VISX, constitutes an antitrust violation. They claim the right to treble damages under Clayton Act Section 4, and to divestiture under Section 16. They also state a claim under Business and Professions Code § 17200 predicated on these alleged antitrust violations. Defendants, on summary judgment, respond that as purchasers from a non-defendant non-conspirator, Plaintiffs lack standing under Sections 4 or 16. Further, Defendants argue that laches bars any equitable relief, and that the state claim is predicated on faulty federal claims.

Plaintiffs assert that the merger of Summit and ATC has had a negative impact on Relevant Markets for LVC equipment, technology, and innovation. *See* Complaint ¶¶ 1–2. Plaintiffs assert that as consumers of LVC equipment, technology, as well as related support products and services, they will suffer injury and a threat to the

continuation of their profitable business. *See id.* ¶ 2.

In support of their "antitrust injury," Plaintiffs submit the statement of an economist, which concludes that a merger between Summit and ATC will have concentration effects on the market. *See* Declaration of James N. Dertouzos ("Dertouzos Decl.") ¶ 13. This economist confirms Plaintiffs' description of the LVC marketplace as being *three* Relevant Markets: LVC Equipment, LVC Technology, and LVC Innovation. Dertouzos predicts that all three Markets will suffer from the merger of Summit with ATC. *See* Dertouzos Decl. ¶ 12. In conclusory fashion, Dertouzos also states that The Laser Eye Center has *already* suffered "economic damage" in the form of "higher prices it has paid" for the twelve Nidek excimer lasers Plaintiffs have bought since the merger.[3] *See* Dertouzos Decl. ¶ 16. However, Dertouzos does not give specifics as to any *estimate* of price differential or other impacts. Nor is there any other specific evidence from Plaintiffs of their "injury."

Defendants' Motion, meanwhile, argues that Plaintiffs are not customers of either Summit or ATC, and therefore have no standing to assert an antitrust claim against the merger. *See* Motion at 7. Furthermore, Defendants argue, Plaintiffs have a thriving business with an estimated 20% share of LVC procedures in the greater Los Angeles area. *See id.* (citing Garabet Deposition, Mot.App.Ex. 6 at 202, 217–18, and Shammas Deposition, Mot. App.Ex. 1 at 6–16). Defendants point out that this success has been achieved without ever purchasing any machines from Summit or ATC. *See* Motion at 8.

---

3. The whole of Plaintiffs' evidence of economic damage is found in the final two paragraphs of Dertouzos' Declaration:
 It should be taken as given that any increases in market power due to the merger will result in higher prices and decreases in product quality and service for all market participants. The merger has already caused economic damage to the Laser Eye Center in the form of higher prices it has paid to acquire twelve Nidek excimer lasers.... Although I have not, at this stage, made an effort to quantify the extent of likely damages, historical pricing patterns and economic logic suggest they would be considerable.
 Dertouzos Decl. ¶¶ 15–16.

Defendants also argue that it is actually VISX that dominates the LVC industry, and that at the time of the merger ATC was not a company that could survive on its own. Defendants note that ATC was embroiled in litigation with VISX, and claim that it was in a precarious financial position. Defendants assert that the merger between Summit and ATC created "pro-competitive synergies," and that the recent entries of Bausch & Lomb and Lasersight, Inc. into the LVC market indicate its health. *See* Motion at 9–12.[4]

## A. *Plaintiffs Lack Standing to Assert a Claim for Damages*

The question of "antitrust standing" is distinct from that of Article III standing. A plaintiff with an "injury in fact" is not necessarily the proper party to bring a private antitrust action. *See, e.g., American Ad Management, Inc. v. General Telephone Company of California,* 190 F.3d 1051, 1054 n. 3 (9th Cir.1999).

The Court notes as an initial matter that it is questionable whether Plaintiffs have even presented enough evidence to raise a genuine issue of material fact as to *any*

injury attributable to a merger between Summit and ATC. Their conclusory allegations that the merger has led to greater market concentration, and therefore to inevitably higher prices paid to Nidek for the 12 lasers that have been bought since the merger was consummated, is unsupported by any *specific* evidence of a change in Nidek's pricing, of such a change being the *result* of the Summit/ATC merger, or even that the Plaintiffs have any reason to suspect that Summit or ATC engaged in any sort of price-fixing that would have included or affected Nidek's pricing. In other words, Plaintiffs have provided nothing to the Court indicating that Nidek even *raised* its LVC prices, let alone that such a raise was a direct result of the merger.[5]

This creates some doubt whether Plaintiffs have even suffered a sufficient "injury in fact" attributable to Defendants to bring proper Article III standing. However, the Court need not decide this issue, because Defendants have successfully argued that these Plaintiffs lack sufficient "antitrust standing" to claim damages.

---

4. As Defendants note, their Motion relies exclusively on their arguments that Plaintiffs lack "antitrust standing" and that they are barred by the doctrine of laches from equitable relief. Thus, the Court need not decide whether ATC was a "failing" company or whether the merger has increased or decreased the competitiveness of the industry. *See* Motion at 9 n. 2 ("background information").

5. The Court notes that Plaintiffs have belatedly filed what is apparently intended as additional evidence of the "injury" that is being alleged by Plaintiffs. *See* Supplemental Declaration of Margaret Mullin Weems ("Weems Decl."), filed September 13, 2000. However, even the excerpted deposition testimony from Dr. Garabet included therein is lacking in any specific evidence that Nidek has raised its prices, or that the merger in any way changed Nidek's pricing policies. *See* Weems Decl. at 2–4:

Q: [H]ow has your business been injured by the fact that Autonomous was not left alone as you described it?
A: We feel if Autonomous was left alone, Autonomous would have been free to go out and charge lower prices, would have driven

the prices of the lasers down in a manner that would make our business easier.
Q: Is there any other way in which you contend that the Laser Eye Center has been injured . . .?
A: If there is a possibility that Autonomous is indeed a state-of-the-art laser, then we feel that we've been—there's been barriers put between us and achieving that potential, that technology or having access to it.
&ast;&ast;&ast;
Q: Is there any other way in which you feel the Laser Eye Center has been injured . . .?
A: Yes. We feel that not only Autonomous was made more expensive, I believe even Nidek is more expensive because Nidek feel [sic] they can charge high prices for their lasers because we have no other place to go or the other places we can go to have, you know, conspired in a price fix arrangement. . . .
Their suspicions and *beliefs* notwithstanding, it is fairly clear that Plaintiffs have not adduced any *specific* evidence of higher prices charged by Nidek, *or* as their cause the Summit/ATC merger.

### 1. Plaintiffs Lack Standing Under Clayton Act Section 4

Section 4 of the Clayton Act authorizes the award of damages under the antitrust laws: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). "This provision is quite broad, and if '[r]ead literally, could afford relief to all persons whose injuries are causally related to an antitrust violation.' " *American Ad Management,* 190 F.3d at 1054 (quoting *Amarel v. Connell,* 102 F.3d 1494, 1507 (9th Cir.1996) (internal citations omitted)). However, it is well-settled that Congress did not intend § 4 to have such a broad scope. *See id.* (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 530–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Thus, courts have required "antitrust standing" for suits by private plaintiffs. *See Associated General Contractors,* 459 U.S. at 535, 103 S.Ct. 897.

■ In *Associated General Contractors,* the Court identified those factors that determine whether a private plaintiff has antitrust standing. The Ninth Circuit recently collapsed these into five:

(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;

(2) the directness of the injury;

(3) the speculative measure of the harm;

(4) the risk of duplicative recovery; and

(5) the complexity in apportioning damages.

*American Ad Management,* 190 F.3d at 1054 (citing *Amarel,* 102 F.3d at 1507 (internal citations omitted)). A substantial part of the reason that the Supreme Court placed these limitations on private antitrust actions is the availability of threefold damages to any successful litigant. *See Associated General Contractors,* 459 U.S. at 535 ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property") (citation omitted). This is reflected in the five factors' focus on the nature, directness and tangibility of the injury, as well as in their recognition of the risk of duplicative recovery and complex damages situations.

The Ninth Circuit has noted that to find antitrust standing, a court need not find in favor of the plaintiff on each factor. *See American Ad Management,* 190 F.3d at 1055 (citing *Amarel,* 102 F.3d at 1507). Nor is any single factor decisive. However, the court should give "great weight" to the *nature* of the private plaintiff's alleged injury. *See id.* at 1055 (citations omitted).

The court in *American Ad Management* went on to "parse" the first factor ("antitrust injury") identified by the Supreme Court into four elements that must be shown by plaintiff: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.*

In this case, the "injury" alleged by Plaintiffs is that as a result of the merger between Summit and ATC, as well as the cross-licensing agreement between Summit and VISX, they have had to pay higher prices for LVC equipment they have since purchased from a fourth company, Nidek. In other words, Plaintiffs allege that the "unlawful conduct" of a merger and agreement that work a restraint on the LVC marketplace has caused them to pay higher prices. *See* Complaint ¶¶ 1–2. They assert that as "direct purchasers" in the Relevant Markets, they have standing to bring an antitrust action.

#### a. The Court Declines to Recognize "Umbrella Standing"

■ Plaintiffs do not assert that Nidek is itself involved in any sort of direct conspiracy with Summit/ATC or VISX, nor is

Nidek named as a defendant in the present suit. Instead, Plaintiffs are asking the Court to hold Summit/ATC liable for losses Plaintiffs have allegedly suffered from having to pay higher prices to Nidek, a non-conspirator, non-defendant, which allegedly *benefited* from a tighter marketplace as a result of the merger of Summit and ATC.

This basis for liability is what is commonly referred to as an "umbrella theory" for Section 4 damages. The theory is that by way of its conduct, Summit/ATC created the "price umbrella" under which Nidek's prices were also artificially pulled skyward.

However, there are three main barriers to "umbrella standing" for damages liability under the antitrust laws. First, this basis for liability has been explicitly rejected by the Ninth Circuit as creating too great a risk of speculative and/or complex damages. *See In re Coordinated Pretrial Proceedings in Petroleum Products, Antitrust Litigation,* 691 F.2d 1335, 1341 (9th Cir.1982) ("Under an umbrella theory, the result of any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy or from numerous other pricing considerations would be speculative to some degree.") [hereinafter *"Petroleum Products II"*]. Plaintiffs correctly point out that the Ninth Circuit decided this issue only in the context of a multi-level distribution system, and expressly reserved the question whether umbrella plaintiffs might be allowed in a single-level distribution context. *See id.* at 1340. As will be demonstrated, however, a portion of the Ninth Circuit's *rationale* for rejecting the "umbrella theory" in a multi-level context is applicable to a single-level distribution system.

In an earlier case, a Central District court explicitly found that a private plaintiff challenging a merger on the sole basis of purchases from a non-conspirator competitor did not have antitrust standing. *See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 1978–1 Trade Cases P 61,880, 1977 WL 1538, *3 (C.D.Cal.1977) ("where a person purchases some product or service from a competitor of the consolidated firm, that person will again be unable to satisfy the standing to sue for damages requirements") [hereinafter *"Petroleum Products I"*]. The court focused on causation problems. *See id.* at *3.

Second, although the Ninth Circuit deliberately left open the question of "umbrella standing" in a single-level distribution market, the *reasoning* of *Petroleum Products II* supports a decision that plaintiffs have not established antitrust standing in this case. In that case, the Ninth Circuit identified two primary reasons that umbrella claims did not have standing: (1) the multi-level market at issue meant that plaintiffs were suing for a kind of "pass-on" damages explicitly disallowed by the Supreme Court in *Illinois Brick v. Illinois,* 431 U.S. 720, 730–31, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) because of the very real danger of duplicative recovery if both direct and indirect purchasers were allowed to claim damages resulting from a single overcharge by an antitrust defendant; and (2) the damages for an umbrella plaintiff would be unacceptably speculative and complex. *See Petroleum Products II,* 691 F.2d at 1341. While the first of these rationales does not apply to a single-level market such as the one at issue in this case, the second certainly does.

The Ninth Circuit also cited with approval the Third Circuit holding in *Mid–West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 584–85 (3d Cir. 1979), in which that court rejected without reservation the possibility of "umbrella" claims. Though some have criticized a direct analogy between the "pass-on" theory disallowed in *Illinois Brick* and the "umbrella claim" plaintiff,[6] as the Third Circuit

---

**6.** *See, e.g.,* II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 372 at 273 (rev. ed. 1995) (noting that standing for the umbrella plaintiff is limited not by *Illinois Brick* but by the more general requirements of proximate causation and proof of damages) [hereinafter *"Antitrust Law"*]; *Petroleum Products II,* 691 F.2d at 1340 (identifying primary bases of

noted, the underlying principle is the same:

> The outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural. As noted in Hanover Shoe, "(a) wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different ..., he would have chosen a different price." ... Although in selecting a price for its product a manufacturer must also take into account the market price for comparable items, to some extent its pricing decisions remain unaffected by the prices charged by others.... Thus, the competitors of the price-fixers may well have charged the same price notwithstanding the conspiracy ... Indeed, given the fact that economists have difficulty explaining the patterns of interdependence in any oligopolistic industry ... it cannot be said that the noncompetitive pricing behavior of any manufacturer would not have taken place absent the conspiracy.

*Mid–West Paper,* 596 F.2d at 584. In this case, as already noted, Plaintiffs have not even sufficiently alleged that Nidek actually *raised* its prices, let alone as a *result* of the merger/conspiracy. However, even assuming that Nidek did raise its prices, whether it did so as a result of the merger or not is total conjecture.

Courts are dissuaded from engaging in speculation about what damages *might* have resulted from anti-competitive conduct. *See, e.g., Illinois Brick,* 431 U.S. at 732, 97 S.Ct. 2061. As one well-supported D.C. District Court opinion recently determined, "umbrella liability" necessarily involves unacceptable processes of speculation and complexity in the award or calculation of damages. "The main difficulty with the umbrella theory is that, even in the context of a single level of distribution, ascertaining the appropriate measure of damages is a highly speculative endeavor. There are numerous pricing variables which this Court would be bound to consider ..." *Federal Trade Commission v. Mylan Laboratories, Inc.,* 62 F.Supp.2d 25, 39 (D.D.C.1999) [hereinafter *"Mylan"*].

There are other courts that disagree, and that have allowed private plaintiffs to proceed with "umbrella" claims, or parallel *types* of claims if not explicitly labeled as such. *See, e.g., In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1166 n. 24 (5th Cir.1979); *In re Arizona Dairy Products Litigation,* 627 F.Supp. 233, 235–36 (D.Ariz.1985).[7] However, both these cases, the Fifth Circuit case directly, the Arizona District Court case indirectly by virtue of its reliance on *State of Washington v. American Pipe and Construction Co.,* 280 F.Supp. 802, 807 (W.D.Wash.1968), apply outdated principles of antitrust law, such as the "target area" test explicitly disavowed by the Supreme Court. *See, e.g., Sacramento Valley Chapter of the National Electrical Contractors Association v. International Brotherhood of Electrical Workers, Local 340,* 888 F.2d 604, 607 (9th Cir.1989) (relying on *Associated General Contractors,* 459 U.S. at 537 n. 33, 103 S.Ct. 897).

Moreover, the weight of *recent* authority, using the nuanced antitrust analysis outlined in *Associated General Contrac-*

---

criticism of the *Mid–West Paper* opinion); *Mid–West Paper,* 596 F.2d at 595–99 (dissent).

**7.** These are the primary cases relied upon by Plaintiffs. Other courts have similarly upheld "umbrella" standing. *See, e.g., In re Uranium Antitrust Litigation,* 552 F.Supp. 518, 525 (N.D.Ill.1982); *Pollock v. Citrus Associates of New York,* 512 F.Supp. 711, 718–19 (S.D.N.Y. 1981) (applying outdated "target area" test);

*In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litigation,* 530 F.Supp. 36, 39–40 (W.D.Wash.1981) (also applying "target area" test). Several older decisions also *reject* "umbrella" plaintiffs. *See, e.g., In re Folding Carton Antitrust Litigation,* 88 F.R.D. 211, 218–20 (N.D.Ill.1980); *Liang v. Hunt,* 477 F.Supp. 891, 896–97 (N.D.Ill.1979); *Reading Indus., Inc. v. Kennecott Copper Corp.,* 477 F.Supp. 1150, 1160–61 (S.D.N.Y.1979).

*tors*, has found against allowing "umbrella" standing to plaintiffs. *See, e.g., Mylan*, 62 F.Supp.2d at 39; *Gross v. New Balance Athletic Shoe, Inc.*, 955 F.Supp. 242, 246–47 (S.D.N.Y.1997) ("the causal connection . . . is attenuated . . . more direct victims exist").

In light of this trend, and under an implicit if not explicit precedent in the Ninth Circuit rejecting "umbrella" standing, this court declines to recognize purchases from a non-conspirator non-defendant as a sufficient basis to assert antitrust standing. The causative links between Defendants' alleged conduct and injuries allegedly suffered by Plaintiffs are simply too attenuated, and the Court finds a substantial risk of duplicative recovery, as the Plaintiffs now before the Court are only tangentially affected.

### b. "Umbrella Standing" Fails the Five Factor Test

█ This brings the Court to a third and final reason to reject "umbrella standing" in this case. Plaintiffs urge that the five-factor analysis in *Associated General Contractors* as encapsulated in *American Ad Management* compels the conclusion that Plaintiffs have standing. The Court disagrees. Application of the factors *also* shows that Plaintiffs lack standing under Section 4.

The five *Associated General Contractors* factors are, again, (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *American Ad Management*, 190 F.3d at 1054. The only one of these that could *possibly* weigh in Plaintiffs' favor is the first, which requires (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to

prevent. The remaining factors all weigh heavily against a finding of standing in this case.

As to the first factor, the Court assumes for the purposes of testing standing that an antitrust violation has occurred.[8] Thus the Court will now assume for this purpose only that the merger of Summit and ATC has created a monopolistic situation, and/or that a conspiracy of some kind can be proven as to Summit, ATC, and VISX. Under these circumstances, as the Court has already noted, there are *still* substantial difficulties defining the "injury" to the Plaintiffs here, since they have provided so little evidence. If Plaintiffs, "injury" is, as they have alleged, higher prices paid to Nidek for post-merger purchases of excimer lasers, Plaintiffs encounter the previously discussed problem of showing that this injury was "caused" by the "unlawful conduct" of Defendants. In addition, it is not clear that this "injury," if any, "flows" from either a concentration in the market or from the "price-fixing" alleged between Summit/ATC and VISX. As has been emphasized, Nidek is an independent entity, a non-conspirator, and has no part in the combination of Summit, ATC, and VISX. As a result, whether this first factor has been sufficiently shown is questionable.

As to the remainder of the factors, the preceding analysis of the "umbrella" theory demonstrates that Plaintiffs in this case fail to satisfy these factors. For instance, because Plaintiffs have sued sellers from whom they have never made purchases, any injury they have suffered is only indirect, due to the necessary intervening actions taken by Nidek. Thus, the second factor weighs heavily against the Plaintiffs, as their injury is neither "direct" nor clearly "caused" by the conduct of Defendants.

Similarly, although this case is now at the summary judgment step, the Court has little evidence of *whether* Nidek's prices even went up. Even if they did, any attempt by the Court to measure how much

---

**8.** *See Antitrust Law* ¶ 360f at 202 (suggesting this approach).

of that increase is attributable to the "price umbrella" and how much to the kinds of independent forces already identified (e.g., elasticity of demand, Nidek's pricing decisions, decreases in production or increases in production costs) would be highly speculative. With treble damages available, this kind of uncertainty is just what concerned the Supreme Court in *Illinois Brick*. To engage in a *speculative calculation*, and then treble it, would be counter to efficiencies sought by the antitrust laws.

For similar reasons, the final two factors also weigh against the Plaintiffs in this case. It is clear that there are two superior classes of plaintiffs available in this matter. First, there are the doctors or other purchasers who have purchased from Defendants *directly*, whose damages would be more demonstrable, and for whom the causal chain would be unbroken. Second, there is Nidek itself, whose claim Plaintiffs are apparently attempting to assert. Presumably, Nidek would be best-suited to demonstrate the market concentration in the LVC equipment industry, to show a "harm" from said concentration, and to prove a "conspiracy."

The fact that Plaintiffs are at best the third-best "persons" to bring suit in this matter indicates the danger of duplicative recovery should any direct purchasers or direct competitors bring damage suits of their own. Furthermore, the very complexity of a damages determination weighs against standing in this case. For all of the foregoing reasons, the Court finds that Plaintiffs have no standing under Section 4 of the Clayton Act as a matter of law.

### 2. Plaintiffs May Lack Standing Under Section 16

In many respects, the standing requirements under Section 16 mirror those already demonstrated for Section 4, except that the plaintiff need only show "threatened injury," rather than showing an actual injury "caused" by a defendant's antitrust violation(s). As the Ninth Circuit has described the different requirements:

To maintain an antitrust divestiture suit, a private plaintiff must generally meet all the requirements that apply to the damages plaintiff, except that the injury itself need only be threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction.

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone*, 140 F.3d 1228, 1234 (9th Cir.1998).

 Thus, Section 16 does not relieve the plaintiff from having to show "antitrust injury." *See Cargill v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). It is only the *type* of antitrust injury that differs. For instance, there is no risk of awarding "duplicative recovery," since a court can as well order one or one hundred similar injunctions against a particular defendant. There is also less danger of complex evidentiary showings that might be required for remote damage claims. As a result, courts have given broader access to Section 16 than to Section 4. For instance, an indirect purchaser *may* obtain injunctive relief, even though such a plaintiff would be barred from damages claims by *Illinois Brick*. *See Lucas Automotive*, 140 F.3d at 1235. However, a plaintiff must still demonstrate that injunctive relief is necessary to prevent injury to its interests rather than those of others. *See, e.g., Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979). Section 16 requires "a threatened loss or injury cognizable in equity … proximately resulting" from an antitrust violation. *Id.* at 1044.

Though Defendants argue primarily that Plaintiffs' claim for divestiture or other equitable relief is barred by the doctrine of laches, which will be addressed below, they also argue that as the Plaintiffs' claims for damages were barred by lack of standing, so should their claims for equitable relief. *See* Motion at 24. The Court makes no finding as to Section 16 standing, but does observe that it is also doubtful that Plaintiffs have standing here.

The problem is that it is not abundantly clear what *kind* of a "threatened injury" will suffice to merit injunctive relief. The Supreme Court has stated that Section 16 does not, for instance, require a showing of threatened injury to "business or property," a requirement for Section 4. *See Cargill*, 479 U.S. at 111, 107 S.Ct. 484. The Court, however, also indicated in *Cargill* that "under both § 16 and § 4 the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent," and went on to note that "the legislative history of § 16 is consistent with the view that § 16 affords private plaintiffs injunctive relief only for those injuries cognizable under § 4." *Id.* at 111–12, 107 S.Ct. 484.

Section 16 standing, therefore, seems to be equivalent to the already-discussed guidelines for Section 4, except that it lacks several important limitations that have been applied to Section 4. First, the injury can be threatened rather than actual. Second, the court need not consider the danger of duplicative recovery. Third, the "directness" of the injury seems less important, given the Ninth Circuit's statement in *Lucas Automotive*, and given that injunctive relief does not require the same "apportionment" among multiple plaintiffs that would be required for damages. Thus, the access to injunctive relief is broader than the access to damages.

However, even given this broader entry-way, Plaintiffs' case faces some possible obstacles to standing under Section 16. First, they have not demonstrated a "threatened injury," since it is conceded that they have no intention of purchasing from these Defendants. In addition, Plaintiffs have not submitted any evidence that they plan to purchase LVC equipment from *any* member of this market in the foreseeable future. Second, Plaintiffs' belated request for compulsory licensing of Defendants' patents as a new alternative equitable remedy may reintroduce the possibility of a "duplicative recovery" into the

case. *See* Opposition at 15. Third, Section 16 still requires that a plaintiff's "injury" be "proximately caused" by antitrust violation(s). Here, for all of the reasons discussed previously, such a showing is doubtful. In this Court's opinion, the close decision of the Ninth Circuit on Section 16 standing in *Lucas Automotive* [9] indicates that this is a difficult, fact-intensive inquiry. Though the Court makes no findings in this case, given the findings on laches, it appears that Section 16 standing is lacking.

### B. *The Doctrine of Laches Bars Plaintiffs' Equitable Remedies*

Even if Plaintiffs could demonstrate Section 16 standing, they are barred by the doctrine of laches from equitable relief. Plaintiffs, in their Complaint, prayed for an injunction against the merger, and/or divestiture. *See* Complaint at 23. However, Plaintiffs' delay in bringing suit makes this remedy unavailable.

The Supreme Court has only relatively recently allowed that a divestiture order is even available in antitrust suits brought by private plaintiffs, after prolonged disputes on this issue. *See California v. American Stores Co.*, 495 U.S. 271, 295, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990). In doing so, the Court was also careful to state that the *power* to divest in private suits "does not, of course, mean that such power should be exercised in every situation in which the [federal] Government would be entitled to such relief." *Id.* at 295, 110 S.Ct. 1853. First, according to the Court, a private litigant must have *standing* as per the antitrust laws ("threatened loss or damage"); "[m]oreover, equitable defenses such as laches, or perhaps 'unclean hands,' may protect consummated transactions from belated attacks by private parties when it would not be too late for the Government to vindicate the public interest." *Id.* Thus, the Court clearly drew a

---

**9.** Judge O'Scannlain did not join the Opinion of the Court as to Part II.B.2, in which the panel found standing under Section 16, and

in dissent stated he would not have done so. *See id.* at 1238.

distinction between equitable defenses as applied to a *private* antitrust plaintiff versus the Government's ability to come late to the issue and still seek equitable relief.[10]

Furthermore, as Defendants point out, divestiture is a fairly extraordinary remedy, that should not be entered into lightly or without substantial evidence that the benefit outweighs the harm. Its far-reaching effects put it at the least accessible end of a spectrum of injunctive relief. Professors Areeda and Hovenkamp explain the courts' reluctance to impose the remedy as follows:

> [D]ivestiture can have far-reaching effects on persons who are not parties to the litigation. It can affect the viability of otherwise profitable companies, the status of pre-existing contracts, and the fortunes of rivals. Of course, none of these concerns is dispositive in the public equity suit and need not be dispositive in the private suit. But they do caution great care before ordering divestiture at the behest of private plaintiffs.

*Antitrust Law* ¶ 346b at 168. Furthermore, whether to grant any form of equitable relief is within the Court's discretion.

■ Laches requires proof of "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). As Defendants effectively demonstrate in their moving papers, both elements are met in this case.

### 1. "Lack of Diligence" By the Plaintiffs

■ Plaintiffs were aware of the impending merger between Summit and ATC in Fall 1998, months before it was consummated. *See* UF ¶ 15; IMF ¶ 15. Plaintiffs do not dispute this knowledge, nor do they dispute that they threatened suit at least two times *before* the merger. *See* UF ¶¶ 18–19; IMF ¶¶ 18–19. Plaintiffs were on notice of the merger, yet took no significant action prior to its consummation. In the very case in which the Supreme Court *allowed* divestiture in private suits, Justice Kennedy's concurrence, quoting the Ninth Circuit's opinion, cast serious doubt upon the appropriateness of this remedy given a *similar* delay in filing suit against a merger. "California could have sued several months earlier and attempted to enjoin the merger before the stock sale was completed.... California must accept the consequences of [its] choice." *American Stores Co.,* 495 U.S. at 298, 110 S.Ct. 1853.

Plaintiffs provide no evidence that they even participated in the FTC investigation of the proposed merger, despite their notice of its planned consummation. Plaintiffs do not argue, nor could they, that their "lack of diligence" might be excused by reason of their desire to wait for the outcome of the FTC investigation. It is undisputed that the FTC decision not to pursue any action was made public in March, 1999, and that Plaintiffs apparently took no formal action between the announcement and the consummation of the merger on April 29, 1999. *See* UF ¶¶ 5–8; IMF ¶¶ 5–8.

Even if the Plaintiffs *did* pursue an administrative remedy, it would have to be a *sustained* "administrative strategy" to stave off a finding of unreasonable delay. *See, e.g., Apache Survival Coalition v. United States,* 118 F.3d 663, 665–66 (9th Cir.1997) ("If the Coalition did in fact pursue its claims through an 'administrative strategy,' little evidence of its toil appears in the record.... Given the state of the record, we cannot say that the 'administrative strategy' rose to the level of conduct

---

10. In fact, Justice Kennedy's concurring opinion clarifies this point. *See id.* at 297–98, 110 S.Ct. 1853 ("Section 7A [of the Hart–Scott–Rodino Act] enables the Federal Government to review certain transactions that might violate § 7 before they occur.... The Act, for instance, may bear upon the issue of laches. By establishing a time period for review of merger proposals by the FTC, § 7A may lend a degree of objectivity to the laches determination.").

which precludes a finding of unreasonable delay").

In this case, the Court has no difficulty concluding that the Plaintiffs failed to exercise proper diligence in the pursuit of their claim(s). Even if they *had* filed suit on April 26 or April 28, just one to three days before the merger was consummated, it is quite possible that their failure to take *any* action for months after knowing about the merger may still have proven fatal to their claims for equitable relief. *See, e.g., Advocacy Org. for Patients & Providers v. Mercy Health Servs.*, 987 F.Supp. 967, 970 (E.D.Mich.1997) (denying a TRO requested days before a merger that had been announced for months because of the delay).

Given that Plaintiffs did not file suit until the day of the merger's consummation, this case is quite similar to *Federal Home Loan Bank Board v. Elliott*, 386 F.2d 42 (9th Cir.1968), wherein a class of shareholders also sought (on non-antitrust grounds) to unwind a merger on the day it was consummated. The Ninth Circuit concluded that the requested relief was barred by the doctrine of laches, because the plaintiffs knew about the merger months before it occurred, yet "deliberately chose to wait until the merger had been effectuated, before commencing court proceedings testing the validity of the merger plan." *Id.* at 54. Plaintiffs' lack of due diligence in pursuing their claim bars a divestiture remedy.

The Ninth Circuit has stated that the costs and complexities of unwinding a merger may be considered in evaluating prejudice to the affected parties. "Moreover, the practical difficulty, if not impossibility, of unscrambling and returning the intermingled assets of the merged Long Beach and Equitable associations, would be seriously prejudicial to Equitable." *Id.* at 55.[11]

## 2. Prejudice to the Defendants

Defendants have evinced sufficient evidence of $45 million already spent on integrating the two companies. They also argue that because of ATC's inability to stand on its own, divestiture would prejudice Summit/ATC customers, because there would no longer be an ATC laser system on the market. *See* Motion at 23. Further, Defendants have already restructured their workforces.

Under these circumstances, the Court is inclined to balance the equities in favor of the Defendants.[12] Defendants would suffer serious prejudice and hardship as a result of divestiture, while it is not clear what *direct* benefit Plaintiffs would gain from the break-up of these two companies.[13] The Court therefore finds that divestiture is barred as a matter of law.

---

**11.** *See also Boone v. Mechanical Specialties Co.*, 609 F.2d 956, 958 (9th Cir.1979) ("The bare fact of delay creates a rebuttable presumption of prejudice") (citation omitted).

**12.** *See, e.g., LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir.1985); *Continental Airlines v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir.1994) (stating that courts should balance hardships between plaintiffs and defendants in considering injunctions).

**13.** The Court also notes that Defendants claim there is not a *single* case where divestiture has been ordered by a federal court at the request of a private party who, "like plaintiffs here: (i) was neither a customer nor a competitor of the merging parties; or (ii) had full knowledge of the merger for months before it closed, but nonetheless did not seek an injunction that would block it. Nor do we believe that there is a single case in which a court has ordered divestiture at the request of a private party like plaintiffs here when the FTC had reviewed, but did not oppose a merger." Motion at 17. In its own research, the Court has also not found cases in these categories. This is not dispositive to the availability of such relief, but does stress the extraordinary nature of this remedy. Defendants repeatedly quote a New York District Court opinion in which the court said that "[p]otentially disruptive remedies such as divestiture of completed transactions involving integration of ongoing business activities have never been granted in private suits under Section 7." *Glendora v. Gannett Co.*, 858 F.Supp. 369, 372 (S.D.N.Y.1994).

**1174**

### 3. The Remedy of Compulsory Licensing is Also Unavailable

██ Plaintiffs belatedly argue in their Opposition to the present Motion that although divestiture may not be available, the Court may instead order compulsory cross-licensing of the patents owned by Summit, ATC (and presumably also VISX, although VISX is not a party to the present action). *See* Opposition at 15.[14] It appears that Plaintiffs recognize the application of the laches doctrine to their claim for divestiture, and are largely abandoning that claim in favor of compulsory licensing.[15] Plaintiffs provide almost no authority for their asserted right to seek compulsory licensing, though the Court does recognize that under the proper circumstances it *may* be appropriate to order compulsory licensing of a patent. *See United States v. Glaxo Group Ltd.*, 410 U.S. 52, 63, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973); *accord Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir.1997).[16] However, facts that might warrant this remedy are not presented in this case.[17]

There are additional reasons for the Court's finding that compulsory licensing is unavailable. First, laches also applies to the equitable remedy of compulsory licensing. As discussed, supra, Plaintiffs' unreasonable delay has prejudiced Defendants.

Second, the compulsory licensing remedy sought by Plaintiffs in this case does not "fit" the unlawful conduct or the "injury" that they have alleged. Plaintiffs claim they have been injured by the unlawful combination of Summit and ATC, occurring as it did alongside the patent licensing agreement between Summit and VISX. Plaintiffs do not explicitly allege patent misuse in this case, or present evidence of the *current* invalidity of the patent license agreements between Summit, VISX, and now ATC as a subsidiary.

Rather, Plaintiffs argue primarily that the merger between Summit and ATC has resulted in a market concentration, that has itself had harmful effects on the marketplace. They are claiming *antitrust* injury, for which standard remedies are treble damages for the injured party, and more recently possible divestiture. It is no coincidence that Plaintiffs could cite no case awarding a compulsory license to a private party in an antitrust suit. Such a remedy would not *address* the harm alleged by the plaintiff. It is inappropriate to order a compulsory license for an antitrust injury that is not explicitly *based* on that patent.[18]

---

**14.** Plaintiffs did not seek this relief in the initial Complaint.

**15.** The Court has already disposed of the divestiture claim, so does not find that Plaintiffs have formally conceded that claim.

**16.** Compulsory licensing is a very rare remedy, and is typically only ordered in cases of patent *withholding*, misuse, or *use* of a patent to monopolize a market. *See* III *Antitrust Law* ¶ 705c at 157–58; *see also Image Technical*, 125 F.3d at 1224–26 (modifying an injunction ordering sale of patented parts so as to delete the requirement that the parts be sold at "reasonable" prices). There is no allegation of explicit patent misuse in this case, and the Court is reluctant to ascribe an antitrust violation to *possession* of a patent. *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir. 1981) ("No court has ever held that the antitrust laws require a patent holder to forfeit the exclusionary power inherent in his patent the instant his patent monopoly affords him

monopoly power over a relevant product market").

**17.** As Defendants point out, the only cases Plaintiffs cite for the availability of compulsory licensing as a remedy to antitrust violations involve actions brought by the U.S. government. *See Besser Mfg. Co. v. United States*, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952); *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973). It is not clear whether this remedy is available in private antitrust actions.

**18.** The Court notes that the ongoing litigation in the District Court in Arizona *does* explicitly address the patents themselves. Because this action is not based on the Defendants' patents, the request again raises the problem of complex damage calculations. It would appear that the damages calculations would require at least a "mini-trial" on patent issues and reasonable royalties.

For all of the reasons the Court has indicated, no such remedy is available.

## C. *The Court Declines to Exercise Supplemental Jurisdiction over Cal.Bus. & Prof.Code § 17200 (Unfair Competition) Claim*

■ The final claim of Plaintiffs' Complaint alleges violations of California's Unfair Competition Act (Cal.Bus. & Prof. Code § 17200 *et seq.*). A district court, within its discretion, may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it once had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well.").

The Court has determined that Plaintiffs are barred as a matter of law from pursuing all of their federal claims for relief. Accordingly, it declines to exercise supplemental jurisdiction over Plaintiffs' state unfair competition claim. *See, e.g., PTI, Inc. v. Philip Morris, Inc.*, 100 F.Supp.2d 1179, 1208 (C.D.Cal.2000). This claim is therefore dismissed without prejudice.

### *CONCLUSION*

Plaintiffs are barred as a matter of law from a private suit for damages under Section 4 of the Clayton Act, due to a lack of standing to pursue such a suit. Plaintiffs are barred by laches, as a matter of law, from pursuing equitable remedies under Section 16 of the Clayton Act. Lastly, the Court has declined to exercise supplemental jurisdiction over Plaintiffs' remaining state unfair competition claim. Based on the foregoing, the Court hereby ORDERS that Defendants' motion for summary judgment is GRANTED.